**SECURITIES AND EXCHANGE COMMISSION, Plaintiff,**

v.

**James H. O'HAGAN, Defendant.**

Civ. No. 3–90–16.

United States District Court,
D. Minnesota,
Third Division.

Aug. 8, 1995.

Robert Michael Small, U.S. Atty. Office, Minneapolis, MN, Ellen B. Cohn, Thomas Vincent Sjoblom, Securities & Exchange Commission, Washington, DC, for plaintiff S.E.C.

John Dwyer French, Faegre & Benson, Minneapolis, MN, George Merrill Roehrdanz, Roehrdanz Law Office, Minneapolis, MN, for defendant James H. O'Hagan.

## MEMORANDUM OPINION AND ORDER

RENNER, Senior District Judge.

### *INTRODUCTION*

Before the Court are the parties' cross-motions for summary judgment. The plaintiff, the Securities and Exchange Commission ("SEC"), brings this action for disgorgement and permanent injunction based upon the collateral estoppel effect of defendant James O'Hagan's prior criminal conviction for securities fraud. O'Hagan moves for summary judgment on the grounds that the SEC's civil action is barred by the Fifth Amendment Double Jeopardy Clause, merger and res judicata, and that the Supreme Court decision in *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,* —— U.S. ——, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994), precludes the remedies sought by the SEC. O'Hagan further argues that collateral estoppel does not apply to the present action as the criminal judgment against him has been stayed pending appeal.

### *BACKGROUND*

### I. THE INDICTMENT

The SEC filed the Complaint in the instant case on January 10, 1990, alleging various securities violations based upon O'Hagan's trading in the securities of the Pillsbury Company, Inc. Following discovery, the SEC moved to stay the civil case in September 1992 and the Court granted the motion. On December 17, 1992, the government indicted O'Hagan based upon the same illegal insider trading in Pillsbury securities as alleged in the civil Complaint. Specifically, the Indictment alleged that from on or before August 26, 1988 through October 17, 1988, O'Hagan

engaged in a scheme and artifice to defraud Grand Met [Grand Metropolitan, PLC] and Dorsey and Whitney in connection with the purchase and sale of securities by purchasing Pillsbury common stock and call options on Pillsbury while in the possession of material, nonpublic informa-

tion concerning Grand Met's future tender offer for Pillsbury common stock.

Ex. A to Declaration of Ellen B. Cohn ("Cohn Decl."), Indictment p. 3, ¶ 2.

The Indictment described O'Hagan's alleged scheme to defraud as follows. Dorsey and Whitney, a Minneapolis-based firm in which O'Hagan was a partner, represented Grand Metropolitan, PLC ("Grand Met") in its planned tender offer for Pillsbury common stock. O'Hagan acquired, through his law partner at Dorsey and Whitney, Thomas Tinkham, material, nonpublic information relating to Grand Met's upcoming tender offer.

From about August 29, 1988 through about September 21, 1988, while in possession of this information, O'Hagan purchased 2,500 Pillsbury call option contracts and 5,000 shares of Pillsbury common stock. Shortly thereafter, on October 4, 1988, Grand Met publicly announced the commencement of its tender offer for all outstanding Pillsbury common stock at $60 per share. One day prior to the announcement of the tender offer, October 3, the Pillsbury stock closed at $39 per share. Following Grand Met's announcement, O'Hagan liquidated his Pillsbury securities, realizing a profit of approximately $4,305,025, excluding commissions paid.

The Indictment further alleged that at the time O'Hagan began purchasing Pillsbury securities, Grand Met had taken substantial steps toward commencing the tender offer. Additionally, it charged that O'Hagan acquired the information relating to the tender offer directly and indirectly from the offeror, Grand Met, and from an agent of Grand Met, attorney Thomas Tinkham. O'Hagan allegedly knew that the information he obtained was nonpublic.

Based upon the above-described insider trading, the Indictment charged O'Hagan with thirty-four counts of securities fraud under sections 10(b) and 14(e) of the Securities and Exchange Act of 1934 ("the Exchange Act") (15 U.S.C. §§ 78j(b) and 78n(e)) and Rules 10b–5 and 14e–3 promulgated thereunder (17 C.F.R. §§ 240.10b–5 and 240.14e–3). For intending to use and using the profits of this illegal insider trading to conceal his prior embezzlement and conversion of client funds,[1] the Indictment charged O'Hagan with three counts of money laundering (18 U.S.C. §§ 1956(a)(1)(B)(i), 1957) and sought criminal forfeiture of two million dollars based on those counts (18 U.S.C. § 982(a)). The Indictment also charged O'Hagan with twenty counts of mail fraud (18 U.S.C. § 1341) based upon the mailing of confirmation slips by the brokerage firms O'Hagan engaged to purchase the Pillsbury securities.

## II. THE CRIMINAL CONVICTION

O'Hagan contested the charges brought against him in a criminal trial held before Judge James J. Rosenbaum. Judge Rosenbaum gave the following instruction to the jury with respect to the Section 10(b) and Rule 10b–5 violations:

> illegal insider trading exists when a defendant, through a relationship of trust and confidence, gains access to material, nonpublic information intended to be used only for corporate purposes, and the defendant trades in the stock of a publicly traded company using information which is not available to the public.

> As for counts 1 through 37, the offense of insider trading has the following elements, and here there are five elements. First, that the defendant gained access to, and then misappropriated material, nonpublic information, which was to be used only for Grand Met's purposes through a relationship of trust and confidence; second, that the defendant traded in Pillsbury securities while in possession of nonpublic information obtained as a result of the confidential relationship; third, the information was material; fourth, the defendant used the information to trade securities with the intent to defraud; ... fifth, the defendant directly or indirectly used any means or instrumentalities of interstate commerce, the mails, or any facility of a national

---

1. O'Hagan was convicted in Minnesota state court of theft by temporary taking based upon his misappropriation of Dorsey and Whitney client trust funds between October 1986 and March 1988. *See State v. O'Hagan,* 474 N.W.2d 613 (Minn.Ct.App.1991).

securities exchange in furtherance of his fraudulent conduct.

Ex. B to Cohn Decl., Crim.Tr. Vol. XII, pp. 27–28. Judge Rosenbaum then further explained each of the five elements. As to the counts under Section 14(e) and Rule 14e–3, Judge Rosenbaum stated:

> The provisions governing Counts 38–54, then, cover the specific situation of insider trading with respect to tender offers. With respect to these counts, illegal insider trading exists when a corporation has taken a substantial step toward the commencement of a tender offer, and the defendant obtains material nonpublic information concerning that tender offer, and the defendant, knowing that this information came from the corporation, invests in securities using material nonpublic information.

*Id.* at 37–38.

The jury returned a guilty verdict on all counts, including the forfeiture count, on February 10, 1994. The court advised the jury that it later would return to determine which assets would be forfeited to satisfy the judgment. The court then provided counsel its proposed jury instruction pertaining to the forfeiture, which stated that under the money laundering statute the defendant "shall forfeit to the United States any property, real or personal, involved in, or traceable to, any money laundering transactions." Ex. D to Affidavit of Elizabeth L. Taylor ("Taylor Aff.").

The government objected to the forfeiture instruction, arguing that the judgment could be satisfied by "substitute" assets of the defendant. The defendant responded that under the statute in effect in 1988, when the offenses took place, the judgment could be satisfied only with property "involved in" or "traceable to" the violation. Ex. F to Taylor Aff. The government subsequently moved to dismiss the forfeiture count with prejudice and the court granted the motion. Ex. G and H to Taylor Aff.

On October 27, 1994, Judge Rosenbaum sentenced O'Hagan to a term of imprisonment of forty-one months followed by a three-year term of supervised release. The court also ordered O'Hagan to pay a fine of $150,000. After sentencing, O'Hagan moved for release pending appeal. His motion was denied by the district court but granted by the Eighth Circuit on appeal. Following the Eighth Circuit ruling, the district court, upon the defendant's motion, stayed the criminal judgment pending appeal. The appeal of O'Hagan's conviction is currently pending before the Eighth Circuit.

## III. THE CIVIL ACTION

Following the conviction and sentence in the criminal action, this Court, upon the SEC's motion, lifted the stay in the instant civil case on November 18, 1994. The Complaint alleges the identical facts as contained in the Indictment and charges O'Hagan with violations of the same federal securities statutes and rules for which he was criminally convicted. The Complaint alleges that O'Hagan violated the federal securities regulations by trading in Pillsbury securities while possessing material, nonpublic information relating to Grand Met's pending tender offer for Pillsbury common stock.[2] As in the Indictment, the Complaint alleges that O'Hagan learned of the tender offer from his law partner at Dorsey and Whitney, Tom Tinkham, who represented Grand Met in that transaction.

The Complaint further states that O'Hagan breached his duty of trust to Dorsey and Whitney and their client Grand Met by purchasing Pillsbury call option contracts and common stock while in possession of this confidential information. Paralleling the Indictment, the Complaint alleges that Grand Met had taken substantial steps toward the commencement of the tender offer at the time O'Hagan began purchasing Pillsbury securities and that O'Hagan knew he had acquired the material information directly or

---

**2.** The Complaint alleges a slightly broader time frame in which O'Hagan engaged in illegal insider trading. *See* Complaint ¶¶ 17–19, 24–26. The SEC moves for summary judgment, however, only as to the conduct and time period contained in the Indictment. The SEC has represented that it will move to dismiss any claims pertaining to the period between July 27, 1988 and August 28, 1988 if it prevails in this motion.

indirectly from the offering person, Grand Met, or from Dorsey and Whitney, acting on behalf of the offering person.

The Complaint alleges that O'Hagan purchased 5,000 shares of Pillsbury common stock and 2,500 call option contracts between August 29, 1988 and September 21, 1988. O'Hagan's total purchase price for the securities including brokerage commissions and other fees was $436,924.81. Following Grand Met's public announcement of its tender offer, O'Hagan liquidated all of his Pillsbury securities, for a total of $4,685,036.61, exclusive of commissions and fees. O'Hagan realized a profit of $4,248,111.80 from his insider trading in Pillsbury securities.[3]

## DISCUSSION

### I. STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56, a moving party is entitled to summary judgment if the evidence shows that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The moving party bears the initial burden of establishing the non-existence of a genuine issue of material fact. *Id.* at 323, 106 S.Ct. at 2553; *City of Mt. Pleasant, Iowa v. Assoc. Elec. Co-op.*, 838 F.2d 268, 273 (8th Cir.1988). Once it meets that burden, the non-moving party may not then "rest upon the mere allegations or denials of his pleading, but ... must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

### II. COLLATERAL ESTOPPEL

The SEC moves for summary judgment on the grounds that the judgment in O'Hagan's criminal case collaterally estops O'Hagan from contesting the issues in the instant case.

■ Under the doctrine of collateral estoppel, a party may not relitigate an issue that has been decided on the merits in an earlier proceeding. *SEC v. Gruenberg*, 989 F.2d 977, 978 (8th Cir.1993). "[T]he judgment in the prior proceeding precludes the relitigation of issues actually litigated and necessary to the outcome of the first action." *Parklane Hosiery Co., Inc. v. Shore*, 439 U.S. 322, 326 n. 5, 99 S.Ct. 645, 649 n. 5, 58 L.Ed.2d 552 (1979).

■ As the Supreme Court has stated, "a prior criminal conviction may work an estoppel in favor of the Government in a subsequent civil proceeding ... [provided the questions were] 'distinctly put in issue and directly determined' in the criminal prosecution." *Emich Motors Corp. v. General Motors Corp.*, 340 U.S. 558, 568–69, 71 S.Ct. 408, 414–15, 95 L.Ed. 534 (1951) (citations omitted); *Gruenberg*, 989 F.2d at 978. The pendency of a criminal appeal does not destroy the finality of a judgment for purposes of collateral estoppel. *United States v. International Bhd. of Teamsters*, 905 F.2d 610, 621 (2nd Cir.1990); *Webb v. Voirol*, 773 F.2d 208, 211 (8th Cir.1985).

■ O'Hagan argues that the stay of his criminal judgment pending appeal deprives the judgment of its preclusive effect. O'Hagan also claims that the Eighth Circuit's Order for release pending appeal undermines the finality of the judgment as it reflects a determination by the Eighth Circuit that substantial doubt exists as to the law or facts surrounding the conviction. *See* 18 U.S.C. § 3143(b) (requiring court to find substantial question of law or fact likely to result in reversal or a new trial prior to releasing a defendant pending appeal). O'Hagan cites no authority for his proposition that a stay or release pending appeal precludes the application of collateral estoppel.

The Eighth Circuit established long ago that a stay does not affect the use of a judgment to work an estoppel: "A supersedeas bond merely operates to stay an execution or other final process on the judgment. It does not vacate the judgment, nor prevent either party thereto from invoking it as an estoppel." *Ransom v. City of Pierre*, 101 F.

---

**3.** The SEC reduced O'Hagan's total profit by the amount he paid in brokerage commissions and other fees. This accounts for the disparity in the SEC's present calculation and the profit of $4,305,025 alleged in the Indictment.

665, 669 (8th Cir.1900). As stated by Professor Moore:

> [the] federal rule is that the pendency of an appeal does not suspend the operation of an otherwise final judgment as res judicata or collateral estoppel, unless the appeal removes the entire case to the appellate court and constitutes a proceeding de novo. *This is true even if the appeal is taken with a stay or supersedeas; these suspend execution of the judgment, but not its conclusiveness in other proceedings.*

1B James W. Moore & Jo D. Lucas, *Moore's Federal Practice,* ¶ 0.416 [3.–2] (2nd ed. 1995) (emphasis added). *See also International Teamsters,* 905 F.2d at 613 (holding criminal judgments final for purposes of collateral estoppel in a related civil case although criminal sentences had been stayed pending appeal).

In his criminal case, O'Hagan vigorously contested the charges against him at trial. The identical factual conduct and violations of law raised in this civil action were "distinctly put in issue and directly determined" against O'Hagan in the criminal trial. *See Emich Motors,* 340 U.S. at 568, 71 S.Ct. at 413. The pendency of his appeal, despite the stay of judgment in the interim, does not suspend the preclusive effect of that judgment in these proceedings. As recognized by the court in *International Teamsters,* should O'Hagan's criminal conviction be reversed, he may seek immediate relief from any adverse judgment entered in this action. *See International Teamsters,* 905 F.2d at 612.

Therefore, notwithstanding the various defenses raised by O'Hagan, which the court will address in turn, collateral estoppel will apply to bar the relitigation of the issues in the present action.

4. The Double Jeopardy Clause states:
   "[N]or shall any person be subject for the same offence to be twice put in jeopardy of life or limb...." U.S. Const., amend. V.

5. The Second and Eleventh Circuits, for example, have held that parallel civil and criminal actions may constitute a single coordinated prosecution. *See United States v. Millan,* 2 F.3d 17, 20 (2nd Cir.1993), *cert. denied,* — U.S. —, 114 S.Ct. 922, 127 L.Ed.2d 215 (1994); *United States*

## III. DOUBLE JEOPARDY

The SEC seeks two forms of relief based upon O'Hagan's violations of Sections 10(b) and 14(e) and Rules 10b–5 and 14e–3: a permanent injunction enjoining O'Hagan from future securities violations, and disgorgement of the profits of O'Hagan's illegal insider trading plus prejudgment interest thereon. O'Hagan asserts several grounds, in addition to opposing the application of collateral estoppel, which he contends bar the sanctions of disgorgement and a permanent injunction.

■ The first and primary argument advanced by O'Hagan is that the present civil action violates the Double Jeopardy Clause of the Fifth Amendment.[4] The Double Jeopardy Clause protects an individual from being subjected to multiple punishments for the same offense in two or more separate proceedings. *Green v. United States,* 355 U.S. 184, 187, 78 S.Ct. 221, 223, 2 L.Ed.2d 199 (1957); *United States v. Halper,* 490 U.S. 435, 440, 109 S.Ct. 1892, 1897, 104 L.Ed.2d 487 (1989).

The SEC acknowledges that the instant civil action involves the same offense underlying O'Hagan's criminal conviction. The SEC does not assert the argument, accepted by some courts, that the two actions do not constitute "separate" proceedings.[5] Thus, the sole question presented in the double jeopardy analysis is whether the civil action for disgorgement and injunctive relief constitutes "punishment" under the Fifth Amendment. O'Hagan asserts that under recent Supreme Court decisions expounding upon the definition of "punishment," the SEC's action, although labeled "civil," nonetheless constitutes an impermissible second punishment under the Fifth Amendment.

*v. One Single Family Residence,* 13 F.3d 1493, 1499 (11th Cir.1994). This logic has questionable viability, however, after the Supreme Court decision in *Department of Revenue of Montana v. Kurth Ranch,* — U.S. —, —, 114 S.Ct. 1937, 1947, 128 L.Ed.2d 767 (1994), wherein the Court held a tax proceeding initiated at the same time as the criminal prosecution to constitute a successive punishment in violation of double jeopardy.

In *Halper*, the Supreme Court called into question the scope of the Double Jeopardy Clause as applied to a civil proceeding brought separately from the criminal prosecution upon which it was based. The *Halper* Court addressed "whether a civil sanction, in application, may be so divorced from any remedial goal that it constitutes 'punishment' for the purpose of double jeopardy analysis." *Id.* at 443, 109 S.Ct. at 1899. Halper was convicted of sixty-five counts of violating the false claims statute, 18 U.S.C. § 287, for submitting fraudulent medicare claims. Halper made a profit, however, of only $585 from the overbilling. He was sentenced to two years imprisonment and a $5,000 fine. *Id.* at 437, 109 S.Ct. at 1896.

Subsequently, the government brought an action against Halper under the civil False Claims Act based upon his criminal conviction. The statute subjected Halper to a penalty of $2,000 for each count, or a total of $130,000. Halper argued that the statutorily authorized penalty, resulting in an amount 220 times greater than the government's loss, violated the Double Jeopardy Clause. *Id.* at 439–40, 109 S.Ct. at 1897.

The Supreme Court promptly dismissed the labels "civil" and "criminal," recognizing that both civil and criminal actions may serve both punitive and remedial goals. *Id.* at 447, 109 S.Ct. at 1901. The protection against double jeopardy, the Court stated, is "intrinsically personal. Its violation can be identified only by assessing the character of the actual sanctions imposed on the individual by the machinery of the state." *Id.*

The Court reasoned that a civil sanction may constitute punishment if the sanction as applied to the individual serves the goals of punishment, to wit, retribution and deter-

rence. *Id.* at 448, 109 S.Ct. at 1901. The Court stated:

> "a civil sanction that cannot fairly be said solely to serve a remedial purpose, but rather can only be explained as also serving either retributive or deterrent purposes, is punishment, as we have come to understand the term.... We therefore hold that under the Double Jeopardy Clause a defendant who already has been punished in a criminal prosecution may not be subjected to an additional civil sanction to the extent that the second sanction may not fairly be characterized as remedial, but only as a deterrent or retribution." [6]

*Id.* at 448–49, 109 S.Ct. at 1901.

Applying these principles, the Court found the civil penalty as applied to Halper to constitute punishment. The Court focused on the lack of any rational relation between the penalty and the loss caused by Halper's crime; rather, the penalty was "so overwhelmingly disproportionate to the damages [the defendant] caused" that the sanction crossed the line between remedy and punishment. *Id.* at 449, 109 S.Ct. at 1901. The Court emphasized, however, that its decision was "the rule for the rare case:"

> [T]he only proscription established by our ruling is that the Government may not criminally prosecute a defendant, impose a criminal penalty upon him, and then bring a separate civil action based on the same conduct and receive a judgment that is not rationally related to the goal of making the Government whole.

*Id.* at 449, 451, 109 S.Ct. at 1901, 1903. The Court vacated the judgment and remanded the case to the district court to determine an amount approximating the government's actual loss from Halper's fraud. *Id.* at 452, 109 S.Ct. at 1903.

---

**6.** The arguably contradictory language of *Halper* ("solely ... remedial" versus "only ... deterrent or retribution") has created some confusion as to the category in which a sanction must exclusively fall to be deemed punishment. *See e.g.*, *SEC v. Bilzerian*, 29 F.3d 689, 696 n. 11 (D.C.Cir.1994). The SEC, of course, focuses on the second clause, defining punishment as serving *only* deterrent or retributive goals. O'Hagan, on the other hand, emphasizes the "solely ... remedial" definition. The court in *United States v. Hudson*, 14 F.3d 536, 540 (10th Cir.1994), analyzed this issue, concluding that a sanction must be exclusively remedial to escape the definition of punishment. The Supreme Court appears to confirm this reading in *Austin v. United States*, —— U.S. ——, 113 S.Ct. 2801, 125 L.Ed.2d 488 (1993), which focuses on the solely remedial language of *Halper*. In *Kurth Ranch*, however, the Court stated that an "obvious deterrent purpose" did not automatically render the sanction at issue a punishment. *See* —— U.S. at ——, 114 S.Ct. at 1946.

The District of Columbia Circuit recently applied *Halper* to a disgorgement action directly on point with the case at bar. In *Bilzerian,* the SEC sought a permanent injunction and the disgorgement of illegal profits based upon Bilzerian's prior criminal conviction for securities violations. Bilzerian had previously been sentenced to four years imprisonment and a $1.5 million fine for his crimes. *Id.* at 691. The court distinguished the disgorgement action from the "rare case" presented in *Halper,* as it required the defendant to surrender nothing more than his illegal proceeds. *Id.* at 696. Rather, the court held, because depriving a wrongdoer of his ill-gotten gains is remedial in nature, disgorgement is not punishment in violation of double jeopardy. *Id. See also United States v. Tilley,* 18 F.3d 295, 300 (5th Cir.) ("the forfeiture of illegal proceeds, much like the confiscation of stolen money from a bank robber, merely places that party in the lawfully protected financial status quo that he enjoyed prior to launching his illegal scheme. This is not punishment 'within the plain meaning of the word.'") (quoting *Halper,* 490 U.S. at 449, 109 S.Ct. at 1902), *cert. denied,* —— U.S. ——, 115 S.Ct. 573, 130 L.Ed.2d 490 (1994); *United States v. Teyibo,* 877 F.Supp. 846, 863 (S.D.N.Y.1995) (holding disgorgement of profits resulting from securities fraud not to constitute punishment within the meaning of double jeopardy).

The holding in *Bilzerian* is consistent with the Eighth Circuit view that the forfeiture of property derived from criminal activity does not constitute punishment because the defendant was never legally entitled to the property. In *United States v. $21,282.00 in U.S. Currency,* 47 F.3d 972, 973 (8th Cir.1995), for example, the Eighth Circuit upheld the forfeiture of property under the Excessive Fines Clause which represented the proceeds of narcotics sales and money laundering. The court held, "[t]he forfeiture of proceeds of criminal activity which 'simply parts the owner from the fruits of the criminal activity' does not constitute punishment and thus does not implicate the Eighth Amendment."[7] *Id.*

(quoting *United States v. Alexander,* 32 F.3d 1231, 1236 (8th Cir.1994)).

■ In the instant case, as in *Bilzerian,* the SEC seeks to disgorge only the illegal profits derived from O'Hagan's securities violations. As a disgorgement order would not deprive O'Hagan of his lawfully obtained property, it does not constitute punishment for purposes of double jeopardy.

Furthermore, under the rational-relation test articulated in *Halper,* the disgorgement of illegal profits necessarily corresponds to the loss incurred by the government and society as a result of the defendant's crime. Because disgorgement will always be proportional, or rationally-related, to the defendant's illegal profit, it does not present the overwhelmingly disproportionate penalty held unconstitutional in *Halper. See Tilley,* 18 F.3d at 299–300 (forfeiture of drug proceeds will always be rational and thus serve a "wholly remedial purpose" under *Halper*).

Therefore, whether distinguishing *Halper* on the grounds that the forfeiture of illegally obtained property cannot qualify as punishment by definition, or by applying *Halper*'s rational-relation test, the Court reaches the same conclusion: the disgorgement action does not constitute punishment under the Double Jeopardy Clause.

This conclusion is consistent with the well-settled characterization of disgorgement as remedial, merely preventing the unjust enrichment as the result of a defendant's wrongdoing. *See e.g., SEC v. Rind,* 991 F.2d 1486, 1493 (9th Cir.) (disgorgement is equitable remedy), *cert. denied,* —— U.S. ——, 114 S.Ct. 439, 126 L.Ed.2d 372 (1993); *SEC v. Tome,* 833 F.2d 1086, 1096 (2nd Cir.1987) (primary purpose of disgorgement is to prevent unjust enrichment), *cert. denied,* 486 U.S. 1014, 108 S.Ct. 1751, 100 L.Ed.2d 213 (1988); *SEC v. Blatt,* 583 F.2d 1325, 1335 (5th Cir.1978) ("Disgorgement is remedial and not punitive.").

Despite the precedent to the contrary, O'Hagan argues that the Supreme Court decision in *Austin v. United States,* —— U.S.

7. The courts define "punishment" the same under the Fifth and Eighth Amendments. *See infra* n. 9.

——, 113 S.Ct. 2801, 125 L.Ed.2d 488 (1993), overrules *Bilzerian, Tilley* and the other decisions and mandates a finding that disgorgement is punishment. *Austin* involved a challenge to an *in rem* civil forfeiture under the Excessive Fines Clause of the Eighth Amendment. In an earlier criminal proceeding, Austin was convicted of possessing cocaine with intent to distribute and sentenced to prison. Subsequently, the United States sought forfeiture of Austin's mobile home and his auto body shop under 21 U.S.C. §§ 881(a)(4) and (a)(7).[8] *Id.* at ——, 113 S.Ct. at 2803.

In deciding whether the civil action was subject to the restrictions of the Eighth Amendment, the Court first considered whether the *in rem* forfeiture constituted punishment.[9] The Court concluded, based upon the historical understanding of forfeiture as punishment, the Congressional intent of the statute to punish and deter and the statute's emphasis on the culpability of the owner, that forfeiture under 28 U.S.C. §§ 881(a)(4) and (a)(7) does not serve a solely remedial purpose as required by *Halper.* *Id.* at ——, 113 S.Ct. at 2812.

The *Austin* Court reached this conclusion by analyzing the forfeiture statute as a whole, in contrast to the *Halper* Court, which focused on the specific sanction applied to the individual. The Court acknowledged its shift in methodology and attributed it to the unique nature of the *in rem* forfeiture at

issue. Unlike the fixed-penalty in *Halper,* which ordinarily corresponds to the government's loss, the Court reasoned, " 'forfeiture of property ... [is] a penalty that ha[s] absolutely no correlation to any damages sustained by society or to the cost of enforcing the law.' " *Id.* at ——, 113 S.Ct. at 2812 (quoting *United States v. Ward,* 448 U.S. 242, 254, 100 S.Ct. 2636, 2644, 65 L.Ed.2d 742 (1980)). Rather, "[t]he value of the conveyances and real property forfeitable under §§ 841(a)(4) and (a)(7) ... can vary so dramatically that any relationship between the Government's actual costs and the amount of the sanction is merely coincidental." *Id.* —— U.S. at —— n. 14, 113 S.Ct. at 2812 n. 14. Because the value of the property seized under the statute bore no relation to the loss resulting from Austin's crime, the forfeiture could not be deemed solely remedial.[10]

O'Hagan argues that under *Austin* the Court must look to the statute as a whole, rather than to the sanction as applied in a particular case, and find the sanction to constitute punishment if the statute serves other than solely remedial goals. O'Hagan relies on *United States v. $405,089.23 U.S. Currency,* 33 F.3d 1210, 1220 (9th Cir.1994), which held the forfeiture of proceeds of illegal narcotics sales and of property involved in money laundering to violate the Double Jeopardy Clause.

**8.** Under these provisions the following is forfeitable:

> (4) All conveyances, including aircraft, vehicles, or vessels, which are used, or are intended for use, to transport, or in any manner to facilitate the transportation, sale, receipt, possession, or concealment of [controlled substances, their raw materials, and equipment used in their manufacture and distribution];
>
> .   .   .   .   .
>
> (7) All real property, including any right, title, and interest (including any leasehold interest) in the whole of any lot or tract of land and any appurtenances or improvements, which is used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of a violation of this subchapter punishable by more than "one year's imprisonment...."

**9.** Although analyzing the issue under the Eighth Amendment, the Court applied the meaning of punishment set forth in *Halper,* thus making no distinction between the Fifth and Eighth Amend-

ments in defining the term. *See Austin,* —— U.S. at ——, 113 S.Ct. at 2806.

**10.** The Supreme Court most recently spoke on the double jeopardy issue in *Kurth Ranch.* *Kurth Ranch* involved a tax on illegal drugs imposed on the defendants subsequent to their criminal prosecution. Although noting that a deterrent purpose does not automatically render the tax punitive, the Court concluded that the state's tax on the possession of dangerous drugs—imposed when the defendant no longer possesses the drugs and conditioned solely on criminal activity—is so far removed from traditional revenue-raising tax assessments as to constitute a form of punishment. *Kurth Ranch,* —— U.S. at ———— ——, 114 S.Ct. at 1946–48. In holding the tax punitive, however, the Court specifically declined to apply the *Halper* rational-relation test as tax statutes differ in purpose from civil penalties. *Id.* at ——, 114 S.Ct. at 1948. The analysis in *Kurth Ranch* thus has little relevance to the civil sanction at issue in this case.

The court in *$405,089.23 U.S. Currency* adopted *Austin*'s methodology as the new legal standard applicable to all civil forfeitures: "Under *Austin*, in order to determine whether a forfeiture constitutes 'punishment,' we must look to the entire scope of the statute which the government seeks to employ, rather than to the characteristics of the specific property the government seeks to forfeit." *Id.* at 1220. An examination of the narcotics proceeds forfeiture statute revealed that any money involved in drug transactions, not limited to illegal profits, is subject to forfeiture. *Id.* at 1221. Similarly, the court found, the money laundering statute subjected to forfeiture property which exceeded in value the actual money laundered. Therefore, the court concluded, as the statutes serve other than solely remedial goals, the forfeitures constitute a second punishment in violation of the Double Jeopardy Clause. *Id.* at 1220–22.

In the Court's view, O'Hagan and the Ninth Circuit in *$405,089.23 U.S. Currency* construe *Austin* too broadly, applying its rationale equally to the forfeiture of property used in the commission of a crime and to the forfeiture of illegal proceeds. *Austin* did not purport to overrule *Halper*'s focus on the sanction as applied to the individual where that sanction is proportionate to the loss caused by the individual. Rather, the *Austin* Court merely applied a different approach to the *in rem* forfeiture of conveyances and real property used to facilitate a crime, which in no case bears any correlation to the resulting loss. *Austin*, — U.S. at —, n. 14, 113 S.Ct. at 2812, n. 14. In such a case, the sanction cannot be deemed remedial, but instead serves the punitive goals of retribution and deterrence. *Austin* says nothing with respect to the case such as this, wherein the sanction directly corresponds to the loss, thus serving the remedial purpose of making the government and society whole. In such a case *Austin* does not apply. *Tilley*, 18 F.3d at 299–300 (rejecting the applicability of *Austin* to the forfeiture of drug proceeds on the grounds that *Austin* applies to the forfeiture of real property and conveyances which are never proportional to the cost of the crime born by the government and society).

Because *Austin* has no application in the context of a disgorgement action, the decision does not alter the Court's conclusion that the disgorgement of O'Hagan's illegal profits does not violate the Double Jeopardy Clause.

As to the permanent injunction, O'Hagan cites no authority that an order enjoining future securities violations is anything but remedial and the Court thus rejects that claim.

## IV. RES JUDICATA

O'Hagan argues that even if the Court finds disgorgement permissible under the Double Jeopardy Clause, the claim is still barred under the doctrine of res judicata. Because the government obtained a judgment on the criminal forfeiture count (Count VI of the Indictment), O'Hagan argues, the disgorgement claim merged into that criminal judgment. Having dismissed the criminal forfeiture count with prejudice, he further contends, the government is barred from again adjudicating the claim.

■ The doctrine of res judicata precludes relitigation of the same claim in a subsequent proceeding. *Cohen v. Lupo*, 927 F.2d 363, 365 (8th Cir.), *cert. denied*, 502 U.S. 861, 112 S.Ct. 180, 116 L.Ed.2d 142 (1991). For res judicata to apply, the prior judgment must be a final judgment on the merits and must involve the same cause of action and the same parties as the subsequent action. When these requirements are met, any claims raised or which could have been raised in the first proceeding are barred from relitigation. *Id.* The Eighth Circuit has identified the proper test to determine the applicability of res judicata as " 'whether *the wrong for which redress is sought* ' is the same in both actions." *United States v. Gurley*, 43 F.3d 1188, 1196 (8th Cir.1994) (citations omitted).

■ Here, the criminal forfeiture count in the Indictment was founded upon the money laundering counts. The Indictment alleged that O'Hagan used the proceeds from his illegal insider trading to purchase cashiers checks in order to replace the embezzled client funds. The criminal forfeiture thus

sought to punish O'Hagan's conduct pertaining to his use of the illegal proceeds.

The action for disgorgement, in contrast, is based upon the illegal insider trading counts. The wrong sought to be remedied by the disgorgement is thus distinct from that which formed the basis for the criminal forfeiture count and res judicata does not apply.

Furthermore, the criminal forfeiture statute, 18 U.S.C. § 982, does not provide for the forfeiture of insider trading profits. Section 982 explicitly lists the offenses for which the government may seek forfeiture; insider trading is not among the enumerated violations.

Instead, to restore the status quo ante and prevent unjust enrichment, the SEC has available to it the equitable remedy of disgorgement. The claim for disgorgement could not have been joined in the criminal trial because of the numerous obstacles involved in raising a civil claim in a criminal proceeding. *United States v. Barnette,* 10 F.3d 1553, 1561 (11th Cir.) (holding the doctrine of res judicata does not bar a civil case brought subsequent to a criminal trial; "[w]e decline to be the first court to misapply the doctrine of res judicata in such a fashion."), *cert. denied,* —— U.S. ——, 115 S.Ct. 74, 130 L.Ed.2d 28 (1994). *See also United States v. Moffitt, Zwerling & Kemler, P.C.,* 875 F.Supp. 1190, 1196 (E.D.Va.1995) (res judicata did not apply to bar action for detinue and conversion subsequent to a criminal forfeiture action, despite that both actions arose from the same transaction, because the government could not have pursued the civil claims in the criminal case).

Because the present claim of disgorgement is predicated on conduct different than that upon which the criminal forfeiture claim was based, and because this claim could not reasonably have been joined with the criminal claim, res judicata does not apply to bar the present action.

## V. *CENTRAL BANK*

O'Hagan next argues that the recent Supreme Court decision in *Central Bank v. First Interstate Bank,* —— U.S. ——, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994), bars both disgorgement and a permanent injunction in this case because the statute does not expressly authorize these remedies.

In *Central Bank,* the Supreme Court held that a private plaintiff may not bring an aiding and abetting action under § 10(b) of the Securities and Exchange Act of 1934. In reaching this decision, the Court held that the statutory text controls the scope of conduct covered under § 10(b). *Id.* at ——, 114 S.Ct. at 1446. Because the statute does not expressly provide for aiding and abetting liability, although Congress knew how to impose such liability if it wanted to, the Court concluded that the act of aiding and abetting extends beyond the conduct prohibited by the statute. *Id.* at ——, 114 S.Ct. at 1448.

Under section 21(d) of the Exchange Act, 15 U.S.C. § 78u(d), the SEC may bring an action to enjoin a person from violating the Act and the regulations promulgated thereunder where it appears that the person "is engaged or is about to engage in acts or practices constituting a violation of any provision" of the Act.

O'Hagan argues for the extension of *Central Bank* to section 21(d). Because the text does not expressly include disgorgement as a remedy for a securities violation, he argues, it is not authorized under the statute. Further, as the statutory text provides for a temporary or permanent injunction for persons engaged or about to engage in a violation, O'Hagan contends, an injunction based upon *past* offenses is not authorized in this case.

## A. Disgorgement

The Exchange Act provides the district courts broad equitable powers over securities violations. 15 U.S.C. § 78aa (§ 27). "Once the equity jurisdiction of the district court properly has been invoked, the court has power to order all equitable relief necessary under the circumstances." *Chris–Craft Indust., Inc. v. Piper Aircraft Corp.,* 480 F.2d 341, 390 (2nd Cir.), *cert. denied,* 414 U.S. 910, 94 S.Ct. 231, 38 L.Ed.2d 148 (1973). Moreover, as stated by the Supreme Court:

When Congress entrusts to an equity court the enforcement of prohibitions contained

in a regulatory enactment, it must be taken to have acted cognizant of the historic power of equity to provide complete relief in light of the statutory purposes.

*Mitchell v. Robert DeMario Jewelry, Inc.,* 361 U.S. 288, 291–92, 80 S.Ct. 332, 335, 4 L.Ed.2d 323 (1960). *See also Franklin v. Gwinnett County Pub. Schs.,* 503 U.S. 60, 70–71, 112 S.Ct. 1028, 1035, 117 L.Ed.2d 208 (1992) ("The general rule, therefore, is that absent clear direction to the contrary by Congress, the federal courts have the power to award any appropriate relief in a cognizable cause of action brought pursuant to a federal statute.").

Disgorgement has long been held to be within the district court's equitable powers under the Exchange Act. In *SEC v. Texas Gulf Sulphur Co.,* 446 F.2d 1301 (2nd Cir.), *cert. denied,* 404 U.S. 1005, 92 S.Ct. 562, 30 L.Ed.2d 558 (1971), the defendants, appealing an order of restitution of illegal profits derived from a § 10(b) violation, argued that the SEC had no authority under the Act to seek any relief other than the injunctive relief provided in § 21(e) [currently § 21(d)]. The court held that the SEC was not restricted to seeking injunctive relief under the Act as long as the relief sought was remedial and not punitive. *Id.* at 1308. *See also SEC v. Ridenour,* 913 F.2d 515, 517 (8th Cir.1990) ("An individual found liable for fraudulently trading federal securities may properly be ordered to disgorge any ill-gotten profits."); *SEC v. Tome,* 833 F.2d 1086, 1096 (2nd Cir. 1987) (upholding order of disgorgement of illegal proceeds from insider trading in violation of §§ 10(b) and 14(e)), *cert. denied,* 486 U.S. 1015, 108 S.Ct. 1751, 100 L.Ed.2d 213 (1989); *SEC v. Materia,* 745 F.2d 197, 200–201 (2nd Cir.1984) (holding that section 21(d) does not restrict the available remedies to injunctive relief), *cert. denied,* 471 U.S. 1053, 105 S.Ct. 2112, 85 L.Ed.2d 477 (1985).

■ O'Hagan asserts that *Central Bank* overruled the numerous decisions upholding disgorgement under the Exchange Act. The Court, however, is unwilling to construe the rather narrow holding of *Central Bank* so broadly as to drastically restrict the district court's long established equitable powers.

In further support of a district court's power to order disgorgement under the Exchange Act is the Insider Trading Securities Fraud Enforcement Act of 1988 ("ITSFEA"). Liability under ITSFEA is limited in part under the following provision:

> The total amount of damages imposed against any person under subsection (a) of this section shall be diminished by the amounts, if any, that such person may be required to *disgorge,* pursuant to a court order obtained at the instance of the Commission, in a proceeding brought under section *78u(d)* of this title relating to the same transaction or transactions.

15 U.S.C. § 78t–1(b)(2) (emphasis added). The reference to disgorgement under § 21(d) [§ 78u(d) ] illustrates the Congressional intent to include the remedy under the statute. Reaching any other conclusion would render § 78t–1(b)(2) meaningless and violate the rule of statutory interpretation to construe statutes as a whole, rather than as isolated provisions. *See e.g., United States v. Morton,* 467 U.S. 822, 828, 104 S.Ct. 2769, 2773, 81 L.Ed.2d 680 (1984).

Because the court's power to order disgorgement under § 21(d) is well established in case law and supported by corresponding statutory language, the Court declines to extend *Central Bank* to eliminate disgorgement as a remedy under the statute.

### B. Permanent Injunction

Relying on the text of § 21(d), which provides for a permanent injunction when a person "is engaged or is about to engage" in securities violations, O'Hagan argues that the SEC exceeds its authority by seeking an injunction based upon O'Hagan's prior conviction. Because the statutory text does not provide for an injunction based upon past conduct, O'Hagan contends, the action exceeds the scope of the statute under *Central Bank.*

■ To obtain a permanent injunction under the Exchange Act, the SEC must prove that O'Hagan violated the law and that there is a reasonable likelihood of future violations. *SEC v. Comserv Corp.,* 908 F.2d 1407, 1412 (8th Cir.1990). Past violations

indicate a propensity to engage in future violations. *Gruenberg,* 989 F.2d at 978 (granting SEC's motion for a permanent injunction solely upon the defendants' prior criminal violation of securities laws); *SEC v. First Am. Bank and Trust Co.,* 481 F.2d 673, 682 (8th Cir.1973) ("very existence of improper conduct in the past raises an inference that such conduct will continue in the future even though the improper conduct has been discontinued").

The likelihood of future violations also depends upon "whether a defendant's violation was isolated or part of a pattern, whether the violation was flagrant and deliberate or merely technical in nature, and whether the defendant's business will present opportunities to violate the law in the future." *SEC v. First City Fin. Corp.,* 890 F.2d 1215, 1228 (D.C.Cir.1989).

■ These considerations weigh in favor of a permanent injunction in this case. O'Hagan did not commit an isolated violation; rather, the large volume of securities traded demonstrates a pattern of illegal activity. O'Hagan obtained his inside information in violation of his basic ethical obligations as an attorney. His misappropriation of confidential information for financial gain constitutes a deliberate and flagrant violation. Further, O'Hagan's insider trading followed his embezzlement of client trust funds for which he was also convicted. This course of conduct demonstrates a propensity to abuse a position of trust and confidence for his own benefit. Additionally, O'Hagan has refused to accept responsibility for his conduct. *See First Am. Bank,* 481 F.2d at 682 ("This inference [of future violations] is even stronger when the wrongdoers insist that their actions are legitimate and do not violate the Act."). The nature and extent of O'Hagan's violations strongly support a permanent injunction in this case.

The holding in *Central Bank* does not alter the Court's conclusion. As discussed above, the Court will not extend *Central Bank* to restrict the remedies available under the Exchange Act. Moreover, the text of § 21(d)

expressly authorizes a temporary or permanent injunction. O'Hagan disputes not the textual authority to seek an injunction, but rather the evidence which the Court may consider to determine a defendant's propensity to engage in future violations. *Central Bank* has no application to that issue.

Because the Court finds a reasonable likelihood that O'Hagan will engage in future securities violations if not enjoined, the SEC's motion for a permanent injunction will be granted.

## VI. PREJUDGMENT INTEREST

■ The SEC seeks prejudgment interest on the amount of O'Hagan's illegal profits to be disgorged, $4,248,111.80. The prejudgment interest from November 1988, when O'Hagan realized his illegal profits, through April 1995 totals $3,406,728.72.[11]

Prejudgment interest, like disgorgement, prevents a defendant from profiting from his securities violations. Courts ordering disgorgement of illegal profits routinely also order payment of prejudgment interest. *See e.g., SEC v. Stephenson,* 732 F.Supp. 438, 439 (S.D.N.Y.1990); *SEC v. Tome,* 638 F.Supp. 638, 639 (S.D.N.Y.1986), *aff'd,* 833 F.2d 1086 (2nd Cir.1987), *cert. denied,* 486 U.S. 1014, 108 S.Ct. 1751, 100 L.Ed.2d 213 (1988). *See also Securities and Exchange Commission v. Blatt,* 583 F.2d 1325, 1335 (5th Cir.1978) (stating that court's power to order disgorgement extends to amount with interest by which defendant profited).

To prevent unjust enrichment resulting from O'Hagan's illegal insider trading, the SEC's motion for prejudgment interest will be granted.

## VII. EAJA

In his response to the SEC's motion for summary judgment, O'Hagan claims that he is entitled to attorney's fees and expenses under the Equal Access to Justice Act ("EAJA"), 28 U.S.C. § 2412. To be eligible for fees under EAJA, the party must, in part,

---

**11.** This figure will be amended to reflect the interest through the date of the Judgment in this case.

prevail in an action brought by or against the United States and show that the United States was not substantially justified in its position. 28 U.S.C. § 2412(d)(1)(A). Based upon the foregoing, O'Hagan has met neither requirement. His claim under EAJA is therefore denied.

### CONCLUSION

Based upon the foregoing, and upon all files, records and proceedings herein, **IT IS HEREBY ORDERED** THAT the SEC's motion for summary judgment (Doc. No. 153) is hereby **GRANTED** and O'Hagan's motion for summary judgment (Doc. No. 156) is **DENIED**.

### I.

**IT IS FURTHER ORDERED** that defendant O'Hagan, his agents, servants, employees, and attorneys, and those persons in active concert or participation with them who receive actual notice of this Final Judgment by personal service or otherwise, and each of them, be and hereby are permanently restrained and enjoined from, directly or indirectly, violating Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b) ] and Rule 10b–5 [17 C.F.R. § 240.10b–5], promulgated thereunder, by, directly or indirectly, using any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange:

   (a) to employ any device, scheme, or artifice to defraud;

   (b) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

   (c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

### II.

**IT IS FURTHER ORDERED** that defendant O'Hagan, his agents, servants, employees, and attorneys, and those persons in active concert or participation with them who receive actual notice of this Final Judgment by personal service or otherwise, and each of them, be and hereby are permanently restrained and enjoined from, directly or indirectly, violating Section 14(e) of the Exchange Act [15 U.S.C. § 78n(e) ] and Rule 14e–3 [17 C.F.R. § 240.14e–3], promulgated thereunder, in connection with any tender offer or any request or invitation for tenders, by:

   (a) purchasing or selling or causing to be purchased or sold the securities sought or to be sought in such tender offer, or any security convertible into or exchangeable for any such security or any option or right to obtain or dispose of any of the foregoing securities, while in possession of material information relating to said tender offer which information they know or have reason to know is nonpublic and which information they know or have reason to know was acquired directly or indirectly from (1) a person who has taken a substantial step or steps to commence, or has commenced, such a tender offer ("an offering person"), (2) the issuer of the securities sought or to be sought by such tender offer, or (3) any officer, director, partner, employee or other person acting on behalf of the offering person or such issuer, unless within a reasonable time prior to any such purchase or sale such information and its source are publicly disclosed by press release or otherwise; or

   (b) communicating material information relating to a tender offer, which information they know or have reason to know is nonpublic and know or have reason to know was acquired directly or indirectly from (1) the offering person, (2) the issuer of the securities sought or to be sought by such tender offer, or (3) any person acting on behalf of the offering person or such issuer, to any other person under circumstances in which it is reasonably foreseeable that such communication is likely to result in a violation of Rule 14e–3 [17 C.F.R. § 240.14e–3] promul-

gated under § 14(e) of the Exchange Act of 1934 [15 U.S.C. § 78n(e)].

### III.

**IT IS FURTHER ORDERED** that defendant O'Hagan shall pay or cause to be paid, no later than seven (7) business days following the entry of this Final Judgment (a) the sum of $4,248,111.80, representing disgorgement of his profits from his purchase and sale of Pillsbury securities; and (b) the sum of $3,406,728.72,[12] representing prejudgment interest on the profits made by O'Hagan from his purchase and sale of Pillsbury securities, in the manner required by Paragraph IV of this Final Judgment.

### IV.

**IT IS HEREBY FURTHER ORDERED** that payment of the amount of $7,654,840.52, as provided in Paragraph III. above, shall be made to the registry of this Court by cashier's check, certified check or money order made payable to "Clerk, United States District Court, District of Minnesota." At such time payment is made to the Clerk of the Court, defendant O'Hagan relinquishes all legal and equitable right, title and interest in these funds. Simultaneous with making said payments O'Hagan shall send a photocopy of the check or money order to the Secretary of the Commission at the following address:

Office of the Secretary

450 Fifth Street, N.W.,

Mail Stop 6–9

Washington, D.C. 20549.

The photocopy shall be accompanied by a letter that identifies O'Hagan as the defendant in this action, the civil action number assigned to the Complaint, the District Court in which the Complaint and this Final Judgment were filed, and the Commission's internal case number (HO–2182). Copies of all such letters to the Secretary of the Commission shall be sent simultaneously to counsel of record for the Commission, Ellen B. Cohn, Esq., Assistant Chief Litigation Counsel, 450

Fifth Street, N.W., Mail Stop 4–2, Washington, D.C. 20549.

### V.

**IT IS FURTHER ORDERED** that the Clerk of the Court shall deposit all funds received pursuant to this Final Judgment from O'Hagan into the registry of the Court in an interest-bearing account ("Account") and shall hold such funds in such Account until further order of the Court directing the disposition of the funds. In no event shall any money in the Account revert to defendant O'Hagan, or his successors, heirs, or assigns. The Commission may prepare and submit a plan of distribution for the Court's consideration. The plan may provide for the appointment of a Fund Administrator to conserve the funds in the Account and to oversee a Court-approved plan of distribution to persons having valid claims under the federal securities laws arising out of the activities alleged in the Complaint. At such time as a Fund Administrator may be appointed, the Clerk of the Court shall transfer the funds from the registry of the Court to the control of the Fund Administrator. Irrespective of the submission of a plan of distribution or appointment of a Fund Administrator, the Commission may move the Court for the appointment of a Tax Accountant to prepare and file appropriate tax returns for the Fund.

### VI.

**IT IS FURTHER ORDERED** that the funds paid by O'Hagan pursuant to Paragraphs III. and IV. above are intended to be a "qualified settlement fund" ("Fund") within the meaning of regulations issued under section 468B(g) of the Internal Revenue Code of 1986, as amended. The Tax Accountant or Fund Administrator may be designated the administrator of the Fund, pursuant to Treas.Reg. § 1.468B–2(k)(3)(i), and shall satisfy the administrative requirements imposed by Treas.Reg. § 1.468B–2, including but not limited to (i) obtaining a taxpayer identification number, (ii) timely filing applicable fed-

---

12. Upon submission by the SEC of the proper calculation of prejudgment interest owing through the date of the Final Judgment, the Court will amend its Order to reflect the correct calculation.

**1476**

eral, state, and local tax returns and paying taxes reported thereon, and (iii) satisfying any information reporting or withholding requirements imposed on distributions from the Fund. O'Hagan shall cooperate with the Tax Accountant or Fund Administrator in fulfilling the Fund's obligations under Treas. Reg. § 1.46B–2.

### VII.

**IT IS FURTHER ORDERED** that all creditors of or persons asserting claims against O'Hagan, and all persons acting on behalf of such creditors or claimants, are restrained and enjoined while the Fund is held in the registry of the Court or by the Fund Administrator from:

(a) commencing, prosecuting, or continuing any suit or proceeding against the registry of the Court, the Fund, or the Fund Administrator;

(b) seeking to enforce any judgment against the registry of the Court, the Fund, or the Fund Administrator;

(c) using self-help or execution or issuing or causing the execution or issuance of any court attachment, subpoena, replevin, execution, or other process for the purpose of impounding, taking possession of, interfering with, or creating or enforcing a lien upon any property owned by, in the possession of, or to be transferred to the registry of the Court, the Fund or the Fund Administrator pursuant to this Final Judgment; or

(d) doing anything whatsoever to interfere with the registry of the Court's or the Fund Administrator's carrying out their duties under this Final Judgment or any subsequent order of the Court, or to harass the Fund Administrator, or to interfere in any manner with the exclusive jurisdiction of this Court over the Fund.

### VIII.

**IT IS FURTHER ORDERED** that this Court shall retain jurisdiction of this matter for all purposes including enforcing the terms and conditions of this Final Judgment.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**