SECURITIES AND EXCHANGE COMMISSION, Plaintiff-Appellant,

v.

FIRST AMERICAN BANK AND TRUST COMPANY et al., Defendants-Appellees.

Nos. 72–1306, 72–1313 (cross appeals).

United States Court of Appeals, Eighth Circuit.

Submitted Nov. 14, 1972.

Decided June 25, 1973.

Thomas Boyle and Walter P. North, Attys., S. E. C., Washington, D. C., for S. E. C.

Frederick E. Saefke, Jr., Bismarck, N. D., for First American Bank & Trust Co.

Before MATTHES, Chief Judge, ME-HAFFY, Circuit Judge, and VAN PELT, Senior District Judge.*

VAN PELT, Senior District Judge.

■ This case involves cross appeals from the judgment and order of the United States District Court for the District of North Dakota denying in all but one respect the request of plaintiff SEC for injunctive relief restraining defendants from violating the anti-fraud provisions of § 17(a) of the Securities Act of 1933.[1] The defendants included First American Bank & Trust Company [First American], Bismarck Investment Corp., which controlled First American, Robert M. Hart [Hart], First American's president and controlling shareholder, Robert Campbell, vice president of First American, and ·Larry Sanders, the secretary of First American.[2]

First American has been involved in a series of legal actions of which this litigation is merely one part.[3] This partic-

* Senior District Judge for the District of Nebraska sitting by designation.

1. 48 Stat. 74, as amended, § 17(a), 15 U. S.C. § 77q (1970):
 "It shall be unlawful for any person in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly—
 (1) to employ any device, scheme, or artifice to defraud, or
 (2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
 (3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser."

2. The SEC also alleged that First American was insolvent and requested the appointment of a receiver; this relief was denied and the court found that First American was solvent. Although such relief is available in the proper circumstances, SEC v. Bennett & Co., 207 F. Supp. 919 (D.C.1962); III L.Loss, Securities Regulation 1508–14 (2d ed. 1961), the SEC does not advance the argument on appeal.

3. In the state court, the State Securities Commission and the State Bank Examiner commenced an action against First American for a permanent injunction restraining it from continuing certain alleg-ed practices. This action was twice the subject of appeals to the North Dakota Supreme Court on preliminary matters. State ex rel. Holloway v. First American Bank & Trust, 186 N.W.2d 573 (N.D. 1971), and 197 N.W.2d 14 (N.D. 1972). In addition, on June 28, 1971, the Examiner issued two orders requiring the bank to relinquish possession of its books, records and other property and to comply with certain listed directives or to show cause why a receiver should not be appointed. The State Supreme Court held that the Examiner could only issue orders to preserve the status quo during the pendency of a hearing before the State Banking Board (although he could make a finding of insolvency) and could not require compliance by First American with his orders or require First American to show cause why a receiver should not be appointed. Only the Board had this power. First American Bank & Trust Co. v. Ellwein, 198 N.W.2d 84 (N.D.1972).

Subsequently, on May 26, 1972, the State Banking Board authorized the Examiner to commence a proceeding before the Board. First American brought an action in federal court to restrain this hearing. This court reversed the lower court's dismissal on the merits and held abstention to be the proper course, in view of the pending state court proceedings. First American Bank & Trust Co. v. Ellwein, 474 F.2d 933 (8th Cir., 1973). This court noted in that opinion that as of December 11, 1972, the Board had heard the matter, declared First American insolvent, and ordered the appointment of a receiver. These orders have been stayed by a state district court.

ular action was commenced on July 7, 1971. Due to the pendency of an action in the state court, the federal district court [Davies, J.], granted defendants' request for a continuance. However, on January 21, 1972, the SEC renewed its motion for preliminary injunction, and on March 24, 1972, the federal district court [Van Sickle, J.] issued the order which is the subject of these appeals.

The basis of the SEC's allegations [4] is a brochure distributed by First American entitled "Questions and Answers." Although on several occasions First American has argued that it is a trust company and thus only bound by North Dakota laws concerning such companies and not those concerning banking institutions,[5] it calls itself a "banking institution," and also compares its services with those of any other bank.[6]

Safety of investment is assured by claims that its funds are invested "carefully and conservatively . . . by highly experienced management," and that there is semi-annual examination and supervision by the State Banking Examiner. The brochure contains statements asserting that "North Dakota laws insure the safety of deposits, trusts and contingent liabilities. Additionally, First American is bonded and insured by major insurance companies." However, the deposits of First American are not insured by a governmental agency or private corporation, and the only other insurance is employee bonding insurance and casualty insurance on First American's furniture. Included in the brochure is the statement that "earnings are guaranteed" although no third party does guarantee the earnings.

The SEC also argued that the brochure omitted material facts, for although it contains a statement to the effect that "[s]emi-annual examinations and supervision by the State Banking Examiner" assure the safety of investments, it fails to point out that the Examiner had issued several highly critical reports concerning the financial condition of First American and certain of its business practices.[7]

---

Counsel for appellants now claims in a showing made since this opinion was first drafted that the Internal Revenue Service has made determinations from which it can or should be determined that First American is solvent.

Because a further hearing will be necessary in this case, unless it has become moot, and since the question of solvency also has been raised in manners above suggested, we would suggest that the trial court consider whether, in order to make a fair and final determination for the protection of the investors, stockholders and the public, the pleadings could be amended to permit a further hearing on insolvency. The request for a receiver is a continuing one.

We agree with the doctrine of abstention. We held up this opinion in hopes that the state court action might moot this point of the controversy. Nevertheless, we recognize that justice delayed is justice denied. It is for this reason we have reminded the trial court of its power to fashion adequate relief in this case, if it is still necessary rather than continue with hearings and appeals in other courts.

4. At the hearing the SEC's proof was somewhat limited in that it relied almost en-

tirely on materials developed by the State Banking Examiner.

5. This argument has appeared in both state and federal litigation. For example, in this action First American argued, and the lower court agreed, that N.D. Cent. Code § 6–07–3(1) (1959), which prescribes one rule for solvency determinations for banks, does not apply to trust companies, and that the proper measure is that for corporations operated for profit, that is, inability to pay debts as they come due in the usual course of business, N.D. Cent. Code § 10–19–02(14) (1959). At other times First American has argued that it need not comply with statutes requiring banks to take corrective action when their capital is impaired or statutes requiring banks to obtain the Examiner's approval before issuing capital notes.

6. It should be noted that under North Dakota law First American could properly call itself a "banking institution." Nelson v. Dakota Bankers Trust Co., 132 N. W.2d 903 (N.D.1965).

7. Critical reports were issued in 1970 and 1971. The first 1971 report was approved by the State Banking Board, and the Examiner thereafter issued the orders

The principal types of "securities" involved were capital notes, certificates of investment, and savings accounts. At the time this action was heard First American had ceased selling or offering for sale the capital notes [8] or the certificates of investment and had removed from its brochure the statements that interest was guaranteed and that deposits were insured by the state of North Dakota.

The lower court made the following findings after a hearing: (1) The statement that "First American is bonded and insured by major insurance companies" is misleading because "[t]o a layman, given the manner or presentation, it would more reasonably mean the funds were protected by something akin to the FDIC." (2) The statement that North Dakota law insures the safety of deposits is true in light of N.D.Cent. Code §§ 6–05–04, –05, and –27 (1959). (3) The statements that First American is a safe place to invest, that management was skilled, and that funds were invested wisely and conservatively were clearly "puffing." (4) The statement that supervision by the Examiner assured adherence to state regulations was not shown to be false. (5) The statement that earnings and interest were "guaranteed" was false in that it implied a third party commitment; however, "on the basis of the evidence presented, the false statement was not material since persons to whom that item was material would normally inquire and discover the correct interpretation of the term," that is, that First American meant "promise." (6) As to nondisclosure, there was no proof that the items to be disclosed were material.[9] (7) The plaintiff failed to prove insolvency.

The court then held:

"We have carefully reviewed the entire record and the evidence adduced at the hearing and conclude that the plaintiff has failed to show a clear

finding First American insolvent and directing it to relinquish its records to the Examiner; these orders were the subject of the North Dakota Supreme Court's opinion that the Board had not observed due process in its deliberation and that the Examiner had no authority to issue such orders without full consideration by the Board. *See* note 1, *supra.* The second 1971 report showed that the position of First American had deteriorated even further.

As an example of the critical nature of these reports, one such report contained the following assertions: (1) First American's capital was impaired (2) since its capital was impaired, its outstanding loans were not in compliance with applicable North Dakota law; (3) a large percentage of its loans were substandard, doubtful or uncollectible, and a number of these loans had been made to the president and controlling stockholder or persons or corporations affiliated with him; (4) $352,591 of $3,140,722 in assets were doubtful because they represented future payments on equipment being leased from the bank; (5) $219,590 of its asserted $631,697 in net worth was unacceptable because it represented capital notes—7% promissory notes of First American that it had purchased for its trust accounts— that had not been issued in compliance

with applicable banking laws; (6) First American does not follow accepted accounting principles, for example, by having no reserve for losses; (7) First American is insolvent in the bankruptcy sense.

8. In his reports the Examiner asserted that First American could not include the capital notes in its capital structure, because prior approval of the Examiner was not obtained as required by the banking law, N.D. Cent. Code § 6–03–41 (1959). However, at the time N.D. Cent. Code § 6–05–34 (1959) did not require trust companies to gain such prior approval.

9. The court noted:
"Both parties admit, and the evidence shows, that there has been wide general discussion on each stage of the proceedings by newspapers of general circulation in the area. To establish failure to disclose in this case, we must assume that the defendant had an affirmative duty to assure the scope of disclosure. But there is another problem also. What is adequate disclosure? Is the newsworthiness standard applied by the reporters the proper standard for the defendant? Where is the evidence that a failure to disclose materially affected the conduct of the investor? We conclude that if there was a failure to disclose, its materiality is not proved."

and immediate risk to the investor, including the uninformed, ignorant and gullible.

"Petition for a temporary restraining order is denied, except that defendant is restrained from implying in its advertising that it is bonded and insured for the protection of the depositors." [10]

Section 17(a) of the Act [11] reads as follows: '

"It shall be unlawful for any person in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly—

(1) to employ any device, scheme, or artifice to defraud, or

(2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser."

■ It is not disputed that First American did offer to sell or in fact did sell through the use of the facilities of interstate commerce, capital notes, certificates of investment, and passbook savings accounts. It is equally clear that for purposes of the Securities Act, these items are "securities." [12] The parties disagree as to the proper characterization of the various statements in the brochure or any alleged omission therefrom.

■ We shall first consider the statements alleged by the SEC to be misrepresentations of material facts. The statements comparing First American to a bank and calling it a "banking institution" were correctly held by the lower court not to involve misrepresentations, since under North Dakota law First American was considered a "banking institution" and could provide a wide range of services similar to those of a bank. [13]

■■ The lower court granted limited relief pursuant to its holding that the statement that "First American is bonded and insured by major insurance companies" was misleading. It is claimed that this is in some respects a true representation in that First American had been issued bonds, such as fidelity bonds, and certain types of insurance. However, a statement which is literally true, if susceptible to quite another interpretation by the reasonable investor (in this case, for example, the interpretation that the deposits were insured by the FDIC) may properly, under § 17(a), be considered a material misrepresentation. [14] Here the finding that the statement was misleading was proper in view

---

10. *See* note 2, *supra*. The Court had several additional comments. It criticized the bank's undisclosed practice of treating future lease and interest payments as current income but also criticized the Examiner's classification of certain leases and loans as doubtful assets. It also noted that the undisclosed practice of leasing and making loans to defendant Hart and his associates deserved special scrutiny, but found in all cases that the terms of these arrangements were reasonable and thus they were acceptable.

11. Securities Act of 1933, 48 Stat. 74, as amended, § 17(a), 15 U.S.C. § 77q (1970).

12. 15 U.S.C. § 77b(1) (1970). This section of the Act provides, in part, that the term "security" means "any note . . . [or] evidence of indebtedness. . . ." *See* Lehigh Valley Co. v. Central Nat'l Bank, 409 F.2d 989 (5th Cir. 1969).

13. *See* note 4, *supra*. It is true that by suggesting that it is a bank, First American might convey the impression that investors are protected by North Dakota banking laws. Under different circumstances such an argument might have merit. *Cf.* notes 15–16, *infra*, and accompanying text.

14. See III L.Loss, Securities Regulation 1431–35 (2d ed. 1961).

of the context in which the statement was made.[15]

The remaining statements involve, among other things, the concept of materiality. The 1933 Act contains a definition of materiality in a slightly different context: "The term 'material' when used to qualify a requirement for the furnishing of information as to any subject, limits the information required to those matters as to which an average prudent investor ought reasonably to be informed before purchasing the security registered." [16]

■ The case law concerning security regulation reflects a similar concept of materiality, generally with a definition taken from common law concepts. As expressed in the Restatement of Torts, a fact is material "if its existence or non-existence is a matter to which a reasonable man would attach importance in determining his choice of action in the transaction in question." [17] This is an objective test [18] and there apparently is no need for a showing, at least insofar as materiality is concerned, that any particular investor relied to his detriment on a misrepresentation, or, in the case of an omission, would have acted differently if there had been no omission.[19]

In its complaint the SEC alleged that the following statements in the brochure violated § 17(a):

"First American Bank & Trust Company provides a convenient and safe place for North Dakotans to keep their savings, make investments and handle their trust affairs . . . .

. . . . . .

15. The lower court made no express finding as to which subsection of § 17(a) was operative. We affirm on the basis that the statement was a material misrepresentation of fact, § 17(a)(2).

At the same point in the brochure the statement is made that "North Dakota laws insure the safety of deposits. . . ." The lower court held that the statement was true because §§ 6–05–04 and –05 of the North Dakota Century Code require a security deposit, and § 6–05–27 provides for an increase of that deposit at the request of the State Banking Examiner when it is "insufficient to insure the safety of its deposit, trust, and contingent liabilities." The SEC argues that only trust beneficiaries have a right of action against the deposit, relying on § 6–05–04.1 (Supp. 1971) : "[The deposit is held] for the benefit of any person making any transfer or deposit of money or property in the state of North Dakota to or with any trust company and who shall suffer loss or damage because of the breach of *any trust* committed by such trust company." The State Banking Examiner also takes this position. There is no definitive state court construction of the statute, but in view of the statutory scheme the lower court's construction is a possible one. We are not certain that the state court would so construe it and the trial court did not so predict. Such an interpretation, of course, calls for a broad reading of the word "trust" in § 6–05–04.1 and might be more plausible to the educated than to a non-educated small investor. In this day of insurance by government created agencies of deposits and of savings and loan accounts the statement that North Dakota laws insure the safety of deposits could well have been read to be an actual misrepresentation. In protecting the public, the SEC has properly raised the correctness of the statement. This panel, differing from the trial judge, would have held it a misrepresentation.

16. 17 C.F.R. § 240.405 (1973).

17. § 538(2). *See Affiliated Ute Citizens v. United States*, 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972) ; *SEC v. Texas Gulf Sulphur*, 401 F.2d 833 (2d Cir. 1968) ; *Myzel v. Fields*, 386 F.2d 718 (8th Cir. 1967), cert. denied, 390 U.S. 951, 88 S.Ct. 1043, 19 L.Ed.2d 1143 (1968).

18. Generally the test is objective, although in certain instances subjective considerations have been injected into the analysis by the courts. 2 A. Bromberg, Securities Law § 8.3 (1967).

19. *Cf.* Affiliated Ute Citizens v. United States, 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972) ; Mills v. Electric Auto-Lite Co., 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970) ; List v. Fashion Park, Inc., 340 F.2d 457 (2d Cir.), cert. denied, sub nom. List v. Lerner, 382 U.S. 811, 86 S.Ct. 23, 15 L.Ed.2d 60 (1965) ; Otis & Co. v. SEC, 106 F.2d 579 (6th Cir. 1939).

All funds are invested carefully and conservatively in securities backed by the full faith and credit of the United States, and in leases, loans, and other assets prescribed by law . . . .

. . . . . .

First American's sound progressive operating policies are established by its Board of Directors, comprised of outstanding leaders in the community, and are administered by highly experienced management . . . ."

In each instance the lower court held that the statements did not violate the statute because they were clearly recognizable as "puffing."

Generally, we can agree with this characterization, although the lower court's holding in regard to the claim that the funds are invested "carefully and conservatively," in view of the subsequent holdings of insolvency, may be one the trial court would alter if the issue should again be properly presented.[20]

In B. Fennekohl & Co., 41 SEC 210, 216 (1962), the Commission stated that

"The concept of 'puffing' is derived from the doctrine of *caveat emptor* and arises primarily in the sale of tangibles where it appears that examination by the purchaser may offset exaggerated statements and expressions of opinions by the salesman. It can have little application to the merchandising of securities."

In the same vein, the Supreme Court reminds us that theories which support common law fraud doctrines and which "developed around transactions involving land and other tangible items of wealth . . . must be adapted to the merchandise in issue." SEC v. Capital Gains Research Bureau, Inc., 375 U.S. 180, 194, 84 S.Ct. 275, 284, 11 L.Ed.2d 237 (1963). This viewpoint in regard to securities regulation was reiterated in Affiliated Ute Citizens v. United States, 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972), where the Court noted:

"The Court has said that the 1934 Act and its companion legislative enactments embrace a 'fundamental purpose . . . to substitute a philosophy of full disclosure for the philosophy of *caveat emptor* and thus achieve a high standard of business ethics in the securities industry.' "

However, if this were the only finding complained of we would not reverse and would let the trial court's conclusion of "puffing" stand.

In regard to the use of the phrase "guaranteed interest," the lower court held that although the manner in which the defendants used the phrase falsely implied a third party commitment, the statement was not material "since persons to whom that item was material would normally inquire and discover the correct interpretation of the term." [21] Thus, there are two questions of fact here, whether the phrase falsely implies a third party commitment and whether the fact is material.[22] As to these questions, we are bound by the substantial evidence rule.[23] However, it is apparent from the holding below that the court's finding was based at least in part on a misapprehension of the concept of materiality,[24] and on this issue we are

---

20. Professor Loss believes that "there is no longer much room for judicial predilection in drawing the line between misrepresentation and 'puffing;' for the 'puffing' concept in the securities context has all but gone the way of the dodo." VI L. Loss, Securities Regulation 3541 (Supp. 1969).

21. The evidence presented by both plaintiff and defendants as to the meaning of the term "guarantee" consisted of those parts of a dictionary definition which served their own purposes.

22. *Cf.* Cannon v. Travelers Indemnity Co., 314 F.2d 657 (8th Cir. 1963); VI L. Loss, Securities Regulation 3534 (Supp. 1969). *But see* SEC v. Texas Gulf Sulphur, 401 F.2d 833, 849 n. 11 (2d Cir. 1968), cert. denied, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1963).

23. Jennings v. McCall Corp., 320 F.2d 64 (8th Cir. 1963).

24. *See* notes 17–19 *supra*, and accompanying text.

not so bound. The holding can be interpreted in three ways: (1) the SEC failed to prove detrimental reliance on the part of any paticular investor; (2) the original misrepresentation was or would be cured by the investors' later inquiries; (3) the misrepresentation was not, in fact, one involving a material fact. Only the last interpretation is consistent with a contemporary understanding of "materiality" in § 17(a). In view of the fact that materiality is normally a question of fact to be determined by the court below in the first instance, we reverse and remand for reconsideration of the factual question.[25]

In considering the SEC's non-disclosure allegations, the trial court raised two questions: (1) Whether First American had a duty of disclosure; (2) whether the facts allegedly not disclosed were material.

 It would seem beyond dispute that the defendants had an affirmative duty under the Act to disclose material facts about the "securities" in question, because the defendants were actively engaged in the promotion and sale of these securities.[26] The question of materiality is more difficult. The standard in omission or non-disclosure cases should be whether a reasonable man in the position of an investor might well decide not to purchase the security if the fact or facts were disclosed. Affiliated Ute Citizens v. United States, 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972); Mills v. Electric Auto-Lite Co., 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970). In its opinion, the lower court, in holding that, if there was a failure to disclose, the facts involved were not material, stated: "Where is the evidence that a failure to disclose materially affected the conduct of the investor? We conclude that if there was a failure to disclose, its materiality is not proved." This holding indicates that the lower court injected into the analysis of materiality the issue of reliance. The question of reliance simply has no part in the consideration of whether the materiality standard of § 17(a) has been met,[27] and so as to this holding also we reverse and remand to the lower court for reconsideration of the factual question.

The final question to which we must turn our attention is the propriety of injunctive relief. As we have seen, the lower court denied the requested relief except in regard to the claim in the brochure that First American was bonded and insured for the protection of depositors.

 The Commission has the authority to bring an action for injunctive relief against violation of the Securities Act pursuant to § 20(b) of the Act:

"Whenever it shall appear to the Commission that any person is engaged or about to engage in any acts or practices which constitute or will constitute a violation of the provisions of this subchapter, or of any rule or regulation prescribed under authority thereof, it may in its discretion, bring an action in any district court of the United States . . . to enjoin such acts or practices, and upon a proper showing a permanent or temporary injunction or restraining order shall be granted without bond." [28]

Since the authority to secure an injunction is granted by statute, the "proper showing" of need would be based on the

---

25. We intimate no views on whether there was a misrepresentation or, if so, whether it involved a material fact.

26. *Cf.* Affiliated Ute Citizens v. United States, 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972); Trussell v. United Underwriters, Ltd., 228 F.Supp. 757 (D. Colo.1964).

27. The question of reliance becomes an issue when one is considering private ac-

tions under, for example, SEC Rule 10b–5. *Cf.* Affiliated Ute Citizens v. United States, 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972); III L. Loss, Securities Regulation 1438, 1765–66 (2d ed. 1961).

28. Securities Act of 1933, 48 Stat. 86, as amended, § 20, 15 U.S.C. § 77t (1970).

682

requirements of the statute and not with reference to the normal requirements for injunctive relief.[29] Once a prima facie case is presented that past violations have occurred, it becomes necessary for the lower court to determine the likelihood of future violations.[30] Injunctive relief may be proper even if there has been no showing that any particular investor has been harmed,[31] and the very existence of improper conduct in the past raises an inference that such conduct will continue in the future [32] even though the improper conduct has been discontinued.[33] This inference is even stronger when the wrongdoers insist that their actions are legitimate and do not violate the Act. Therefore, we hold that the relief granted by the trial court was proper. It only remains on a rehearing to determine, in event the case is not mooted, whether the scope of relief should be broadened.

The action is affirmed in part and reversed in part, and remanded.

29. III L. Loss, Securities Regulation 1979 (2d ed. 1961).

30. SEC v. Bennett & Co., 207 F.Supp. 919 (S.D.N.Y. 1962).

31. SEC v. Pearson, 426 F.2d 1339 (10th Cir. 1970) ; III L. Loss, Securities Regulation 1975–79 (2d ed. 1961).

32. SEC v. Keller Corp., 323 F.2d 397 (7th Cir. 1963).

33. Hecht v. Bowles, 321 U.S. 321, 64 S.Ct. 587, 88 L.Ed. 754 (1944).