**UNITED STATES SECURITIES AND EXCHANGE COMMISSION,**
Plaintiff,

v.

**Nicholas A. ZAHAREAS, Tuschner & Company Inc., John M. Tuschner, and Euroamerican Securities S.A., Defendants.**

No. CIV. 97–2859 DSD/JMM.

United States District Court,
D. Minnesota.

June 19, 2000.

Jeanette L. Lewis, Lori A. Trowbridge, James L. Kopecky, John E. Birkenheier, Michael Caywood, and Securities and Exchange Commission, Chicago, IL, for plaintiff.

James H. Schropp, Fried, Frank, Harris, Shriver & Jacobson, Washington, DC, and Robert D. Butterbrodt, and Butterbrodt Law Office, St. Paul, MN, for defendant John M. Tuschner.

## ORDER

DOTY, District Judge.

This matter is before the court on plaintiff's motion for summary judgment and for entry of permanent injunction against John M. Tuschner, and defendant John M. Tuschner's cross-motion for summary judgment of dismissal. Based on a review of the file, record, and proceedings herein, the court grants plaintiff's motion for summary judgment and for entry of permanent injunction and denies defendant's motion for summary judgment.

## BACKGROUND

Defendant John M. Tuschner (Tuschner) is the former president and CEO of Tuschner & Company, Inc. ("Tuschner & Co.").[1] Tuschner & Co. is a securities broker-dealer registered with the Securities and Exchange Commission ("Commission"). Defendant Nicholas Zahareas ("Zahareas") is a United States citizen and the president and majority shareholder of defendant Euroamerican Securities, S.A. ("Euroamerican"), a brokerage and financial consulting firm doing business in Athens, Greece. The Commission commenced this action against Zahareas, Euroamerican, Tuschner & Co. and Tuschner seeking injunctive relief against defendants for violations and aiding and abetting of violations of federal securities laws. Although the general factual background of this dispute has already been set out in the court's January 1998 order granting plaintiff's motion for preliminary injunction, the parties have since conducted extensive discovery and now present this case for a ruling on cross motions for summary judgment. Accordingly, a review of the material facts is appropriate at this juncture.

In June 1992, the Commission filed suit against Zahareas in the District Court of Minnesota alleging violations of federal securities laws. In July 1992, the court (Hon. Donald J. Alsop) permanently enjoined Zahareas from committing future violations of the antifraud provisions of federal securities laws. In addition, in July 1993, the Commission permanently barred Zahareas from associating with any broker, dealer, investment advisor or investment companies in the United States securities industry (the "bar order").

In February 1996, Zahareas and Tuschner were introduced to each other by the CEO of ACT Teleconferencing ("ACT"). At the time of this introduction, Tuschner & Co. was acting as underwriter for an initial public offering ("IPO") by ACT. Under the terms of the offering, Tuschner & Co. would not be paid unless it sold a minimum number of securities within a certain period of time. The time period for the offer was expiring, and the CEO of ACT introduced Zahareas to Tuschner as someone who could refer customers to participate in the ACT IPO.

Tuschner and Zahareas first spoke in approximately February 1996, and met in person in March or April 1996. Zahareas informed Tuschner that he could not participate in the offering and receive commissions from Tuschner & Co. because he was subject to a "ban" from the SEC. Zahareas also informed Tuschner that because of the ban, Tuschner could not pay him commissions. Tuschner testified that he learned of the bar order in this same time period, although he did not receive written confirmation of the order until May 1997. Nevertheless, Tuschner and Zahareas reached an agreement whereby Zahareas would recruit Greek citizens to purchase ACT securities and in return he would receive a fee of 8 percent of the total revenues generated by the ACT IPO. Tuschner considered this payment to be a "foreign finders fee." [Tuschner test., p. 126.]. Although Tuschner and Zahareas never memorialized their agreement in a written contract, Tuschner did sign a deal-

---

1. Tuschner left formal employment with Tuschner & Co. on June 9, 1999. [Tuschner dep., p. 7].

er agreement with Zahareas' wife, Katerina Kopsida, which set forth the terms of this arrangement. Tuschner later determined that Kopsida was not a dealer, and although Zahareas testified that Kopsida did not actually take part in the ACT transactions, the "finder's fee" from the ACT IPO was paid into Kopsida's bank account in Greece.

Following the ACT IPO, Zahareas established Euroamerican Securities and continued to refer Greek investors to Tuschner & Co. Zahareas estimates he referred between 200 to 300 customers to Tuschner & Co. For each such customer, Tuschner & Co. supplied Zahareas with all the necessary paperwork which he would complete and return to Tuschner & Co. Either Tuschner or the compliance officer of Tuschner & Co. would review the materials, and if needed, they would request additional information from Zahareas. Each new customer was assigned a Tuschner & Co. account number and received a welcome letter from Tuschner & Co. Zahareas testified that Euroamerican provided none of the paperwork to establish these accounts or facilitate trading.

From June 1996 to autumn 1997, the Greek customers referred to Tuschner & Co. by Zahareas continued to buy and sell ACT securities, as well as securities from a company called "RLD." At first Zahareas initiated the trades through Tuschner, but later Tuschner authorized his trader to accept orders directly from Zahareas. At the end of each month Zahareas received commission runs from Tuschner & Co. showing the trades that had occurred in the Greek customer accounts and the amount of money due to Euroamerican as commissions. For each trade Euroamerican received compensation amounting to 75 percent of the gross charges to the

customer.[2] In addition, each customer received monthly and quarterly account statements from Tuschner & Co. Although Tuschner received an occasional phone call directly from a Greek customer, Tuschner testified that neither he nor his firm's registered representatives ever solicited these Greek customers.

Following inquiries from the SEC about the dealings of Tuschner & Co. with Zahareas and Euroamerican, Tuschner sent Zahareas a letter dated September 3, 1997, in which he advised that Euroamerican and Tuschner & Co. should cease doing business with each other. Tuschner also directed Zahareas to contact him to make arrangements to "transfer the accounts which we now maintain with Greek clients referred to us by you to an alternative Greek broker-dealer or investment advisor firm."

On September 5, 1997, Tuschner testified in a Commission investigation that Tuschner & Co. had ceased doing business with Zahareas and Euroamerican. [Tuschner test., pp. 121–22]. However, John Penshorn, a trader with Tuschner & Co., continued to send Zahareas money line reports and was in phone contact with Zahareas as late at November 1997 about structuring a cross-trade. Tuschner also authorized Penshorn to accept trade directions on the Greek accounts from a brokerage firm called "Nunox" which was co-owned by one of the owners of Euroamerican.[3]

As of December 1997, the Greek customer accounts had not been formally transferred away from Euroamerican and Tuschner & Co. had not contacted its Greek customers regarding termination of its relationship with Zahareas. Therefore, the Commission brought suit on December 19,

---

**2.** Although the parties do not provide a total revenue figure, from March 1997 to July 1997, Tuschner & Co. earned at least $213,554.33 in gross commissions on $9,430,000 worth of trading in the Greek accounts. Of this amount, at least $144,973.32 was paid to Euroamerican. [Miller Aff., ¶ 22].

**3.** Penshorn testified that the cross-trade that Zahareas discussed with him was later ordered by Nunox. [Penshorn test., p. 119]

1997, and applied for a temporary restraining order and preliminary injunction. This court concluded that the evidence supported a finding that Zahareas associated with Tuschner & Co. and that Tuschner aided and abetted in the association, and issued a preliminary injunction enjoining the association. On appeal, the United States Court of Appeals for the Eighth Circuit affirmed the preliminary injunction. *SEC v. Zahareas,* 167 F.3d 396 (8th Cir.1999) (per curiam). The parties now bring these cross motions for summary judgment.[4]

## DISCUSSION

### I. Summary Judgment

Summary judgment is appropriate where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c). The moving party bears the burden of demonstrating to the court that no genuine issue of material fact exists. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A fact is material only when its resolution affects the outcome of the case. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A factual dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party. *See id.* at 250, 106 S.Ct. 2505.

On a motion for summary judgment, all evidence and inferences are to be viewed in a light most favorable to the nonmoving party. *See id.* at 255, 106 S.Ct. 2505. The nonmoving party, however, may not rest upon mere denials or allegations in the pleadings, but must set forth specific facts sufficient to raise a genuine issue for trial. *See Celotex,* 477 U.S. at 324, 106 S.Ct. 2548. Moreover, if the plaintiff cannot support each essential element of its claim,

summary judgment must be granted because a complete failure of proof regarding an essential element necessarily renders all other facts immaterial. *See id.* at 322–23, 106 S.Ct. 2548. With this standard at hand, the court considers the parties' cross motions for summary judgment.

The Commission alleges here that Tuschner is liable under Section 20(e) of the Securities Exchange Act of 1934 ("the Exchange Act"), which provides in pertinent part that "any person that knowingly provides substantial assistance to another person in violation of a provision of the [Exchange Act or of any rule issued thereunder] shall be deemed to be in violation of the provision to the same extent as the person to whom such assistance is provided." 15 U.S.C. § 78t(e). Therefore, to prevail on this claim against Tuschner, the Commission must show that Tuschner & Co. and Zahareas violated federal securities laws and that Tuschner knowingly aided and abetted those violations.

The violations alleged by the Commission are: (1) that Zahareas violated Section 15(b)(6)(B)(i) of the Exchange Act, 15 U.S.C. § 78o(b)(6)(B)(i), by associating with Tuschner & Co. in contravention of the Commission's 1993 bar order and (2) that Tuschner & Co. violated Section 15(b)(6)(B)(ii) of the Act, 15 U.S.C. § 78o(b)(6)(B)(ii), by permitting Zahareas to associate with it with knowledge of the bar order. Defendants dispute that Zahareas associated with Tuschner & Co., therefore, the fundamental issue before the court on these cross motions for summary judgment is whether Zahareas was an "associated person" of Tuschner & Co. for purposes of liability under Section 20(f).

An "associated person" is defined in Section 3(a)(18) of the Exchange Act to include three categories of persons: (1) any partner, officer, director or branch manager of the broker-dealer; (2) any person

---

4. This matter was originally set for jury trial beginning on April 10 2000, but defendant Tuschner withdrew his jury demand [Doc. No. 155] and the case was rescheduled for cross-motions for summary judgment.

directly or indirectly controlling, controlled by, or under the common control with such broker-dealer; and (3) any employee of such broker-dealer. 15 U.S.C. § 78c(a)(18). The Commission alleges that Zahareas was controlled by Tuschner & Co. and was therefore an "associated person" under the Exchange Act. Tuschner counters that he is not an associated person because Tuschner & Co. did not exercise the requisite control over his business activity.

The Exchange Act does not define "control" as used in Section 3(a)(18), and a cohesive body of law applying the concept to aiding and abetting liability has not been established. The Commission has long-advocated a broad construction of the provisions of the Exchange Act "so as to prevent evasion of the Act's proscription against broker-dealers engaging in the securities business with associated persons subject to statutory disqualification." *Van Alstyne, Noel & Co.*, 1969 WL 4932, at *5 (S.E.C. Jan. 31, 1969). Also, as part of its regulatory program for dealer registration and reporting, the Commission has defined "control" (including the terms "controlling," "controlled by" and "under common control with") to mean "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." 17 C.F.R. § 240.12b–2 (1991).

Absent a statutory definition, courts have applied the Commission's regulatory definition in other contexts, holding generally that "control" embraces the notion of an indirect means of influence. For example, in the context of "controlling person," or joint and several liability under Section 20(a) of the Act, 15 U.S.C. § 78t(a),[5] the Eighth Circuit has reasoned that "control" requires "only some indirect means of discipline or influence short of actual direction." *See Myzel v. Fields*, 386 F.2d 718, 738 (8th Cir.1967), *cert. denied*, 390 U.S. 951, 88 S.Ct. 1043, 19 L.Ed.2d 1143 (1968).

■ Finally, the Commission has also indicated that general principles of agency law are relevant to the determination of whether a person is associated with a broker-dealer. *See* Letter from Douglas Scarff, Director, Division of Market Regulation, SEC to Gordon S. Macklin, President, NASD, [1982–83 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 77,303 (June 18, 1982). An agency relationship is "the fiduciary relationship which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." *Church of the Nativity of Our Lord v. WatPro, Inc.*, 491 N.W.2d 1, 5–6 (Minn.1992) (quoting Restatement (Second) of Agency § 1 (1958)).

■ Tuschner asserts here that Zahareas was not an agent of Tuschner & Co., but rather was an independent person who engaged only in contractually-defined arm's length transactions with Tuschner & Co. As evidence of Zahareas' independent status Tuschner emphasizes that: (1) Tuschner & Co. did not withhold taxes or provide any form of employee benefits to Zahareas; (2) Tuschner & Co. personnel

---

5. Section 20(a) of the 1934 Act provides:
   Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

Although Section 20(a) is frequently invoked in the context of the employer-employee relationship, *see, e.g., Martin v. Shearson Lehman Hutton, Inc.*, 986 F.2d 242, 244 (8th Cir.1993), broker-dealers have been held liable under Section 20(a) for associating with independent contractors, *see Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1574 (9th Cir.1990), and finders, *see Van Alstyne, Noel & Co.*, 1969 WL 4932 (S.E.C. Jan. 31, 1969).

never visited Euroamerican's offices in Greece; and (3) Tuschner & Co. had no responsibility to provide telephones and other office equipment to Zahareas or pay Euroamerican's bills.

From a purely agency law perspective this evidence, standing alone, does weigh in favor of independent contractor status and against a finding of associated person status. *See e.g., SEC v. Telsey,* 1991 WL 72854 (S.D.N.Y. March 13, 1991) (finding that defendant was associated with several broker-dealers where defendant, among other things, was in the various broker-dealer's office on a daily basis during business hours and had his own desk and telephone in one broker-dealer's office, which he answered with the name of the broker-dealer).

■ However, as the Restatement points out, an independent contractor may or may not be an agent. Restatement (Second) Agency § 2(3) (1958). Moreover, the court notes that under Minnesota law, where there is some element of control and a fiduciary relationship, the absence of physical control or supervision is not definitive proof of non-agency status. *See Jurek v. Thompson,* 308 Minn. 191, 241 N.W.2d 788, 791–92 (1976). Therefore, even if the court were to evaluate the issue purely from an agency law perspective as opposed to a broader securities law perspective, merely denoting Zahareas as an independent contractor and emphasizing the physical separation of the two business operations does not resolve his status.[6]

The precise issue before the court is whether Tuschner & Co. exerted sufficient influence over Zahareas' securities dealings to render Zahareas an "associated person" as the term is used in the Exchange Act. The court finds that the evidence sufficiently establishes that Zahareas was controlled by Tuschner & Co. therefore he was an "associated person" under federal securities law.

First, with respect to the ACT IPO, it is undisputed that Tuschner & Co. was the underwriter for the IPO, and in that capacity, it controlled access to ACT shares. Tuschner testified that ACT's CEO introduced Zahareas to him specifically to facilitate Greek investment in ACT. Therefore, contrary to Tuschner's assertion that Zahareas could terminate the relationship at any time, Zahareas was completely dependent on Tuschner's control of access to the ACT IPO. Moreover, after the IPO, Zahareas directed between 200 to 300 Greek investors to Tuschner & Co. and he testified that "there were no other entities that Euroamerican did business with in the United States other than Tuschner." [Zahareas dep., p. 134].

Finally, when the Commission began its investigation of Tuschner & Co., Tuschner sent Zahareas a letter in September 1997, in which he formally severed ties with Zahareas and directed him to transfer the accounts of the Greek investors to another Greek broker-dealer or investment advisor firm.[7] When asked by the SEC in Decem-

---

**6.** Notably, the Commission has previously emphasized that it "does not recognize the concept of independent contractors for purposes of the Exchange Act, even if an arrangement with an associated person satisfies the criteria for 'independent contractor' status for other purposes." SEC Release No. 34–36742, *In re William V. Giordano,* 1996 WL 21031, at *4–5 (S.E.C. Jan. 19, 1996); *see also* Macklin letter at ¶ 77,303. Therefore, in the Commission's view, an independent contractor can engage lawfully in the securities business only if he is either: (1) registered as an NASD broker-dealer or (2) registered as an associated person of a broker-dealer. *See also Hollinger v. Titan Capital Corp.,* 914 F.2d 1564,

1573–74 (9th Cir.1990), *cert. denied,* 499 U.S. 976, 111 S.Ct. 1621, 113 L.Ed.2d 719 (1991). Under this scheme, if an independent contractor is not a registered broker-dealer, he is by elimination an associated person whose securities transactions must be supervised by a broker-dealer.

**7.** In an apparent response to the Commission's inquiry and Tuschner's directives, Tuschner was contacted by representatives of a brokerage firm called Nunox regarding transfer of the Greek investor account. [Tuschner test., pp. 220–28]. Nunox is a Liberian corporation which, according to Zahareas, was formed shortly after the Commission began its

ber 1997 whether Zahareas had agreed to the transfer, Tuschner responded "He has no choice on it. They will be transferred." [Tuschner test., p. 230]. Based on this evidence the court believes a reasonable factfinder would conclude that Tuschner & Co. and Zahareas engaged in an exclusive relationship which Tuschner & Co. controlled.

Tuschner & Co. also controlled Zahareas in that Zahareas relied exclusively on Tuschner & Co. materials and procedures to establish accounts for the Greek customers in the United States and conduct trading for them in U.S. securities. Zahareas used Tuschner's account opening materials, applications, W–8 tax forms, margin agreements and other necessary paperwork to engage in trading on behalf of the Greek customers. Each Greek customer was assigned a Tuschner & Co. account number and received monthly and quarterly account statements from Tuschner & Co. By contrast, Euroamerican provided no independent paperwork or monthly account statements to the Greek customers who were trading on U.S. markets.[8] In addition, all new account documentation and order tickets submitted by Zahareas were subject to review by Tuschner & Co.'s compliance officer and Zahareas was required to correct any errors or omissions or risk cancellation of the trade. Zahareas' complete reliance on the forms and procedures of Tuschner & Co. indicates that Tuschner & Co. exercised control over "the means and manner of performance." *See Guhlke v. Roberts Truck Lines,* 268 Minn. 141, 128 N.W.2d 324, 326 (1964); *see also Corbin v. Commissioner of Revenue,* 307 Minn. 237, 240 N.W.2d 809, 812 (1976) ("[T]he determinative right of control is not merely over what is to be done, but primarily over how it is to be done. Basically, it is the distinction between a person who is subject to orders as to how he does his work and one who agrees only to do the work in his own way.")

Tuschner dismisses his firm's review of Zahareas' trading as typical of any securities dealings conducted under federal securities laws, but as the Commission argues, that is exactly the point. Where Zahareas relied exclusively on the connection with Tuschner & Co., utilizing only Tuschner & Co. paperwork and procedures to facilitate all of its trades and earn substantial commissions, Zahareas was a Tuschner & Co. representative in everything but name. He used the same forms to open Tuschner & Co. accounts for the Greek investors as other registered representatives used. He was assigned an account executive number, just like any other registered representative (although in Zahareas' case, the number simply referred to "foreign accounts"), and the customers he referred to Tuschner & Co. were assigned Tuschner & Co. account numbers. His "foreign accounts" account executive number appeared on all documents regarding the Greek accounts, including the monthly and quarterly statements sent directly to those investors. He contacted Tuschner & Co.'s trading desk directly and placed trade orders for the Greek customer accounts, just as any Tuschner & Co. representative would do. He received monthly commission runs for the Greek accounts and calculated commissions based on Tuschner & Co.'s commission schedule, just as any other Tuschner & Co. representative would do. Finally, no registered representative from Tuschner & Co. was assigned to the Greek accounts or solicited those investors in any way. In other words, like a Tuschner & Co. registered representative, Zahareas was the primary contact person on those accounts.

Zahareas performed all the usual and customary duties of a registered representative of Tuschner & Co., and in that re-

---

inquiry into Tuschner & Co. [Zahareas dep., p. 238]. One of its owners, Nikos Moschos, is also a part owner of Euroamerican. [Zahareas dep., pp. 238–240].

8. The evidence does indicate that Zahareas provided Tuschner & Co.'s Greek investors with a monthly investment newsletter. [Tuschner test., p. 166].

gard, a reasonable factfinder would conclude that he was controlled by Tuschner & Co. *See Van Alstyne Noel & Co.,* 43 S.E.C. 1080, 1087 (1969) (finding that while defendant may not have been an employee of the registrant, where he performed the usual and customary functions of the registrant's investment banking employees, he was a "controlled person" of registrant).[9] Therefore, based on a broad construction of the provisions of the Section 3(a)(18) and the evidence of Tuschner & Co.'s influence over and control of Zahareas' securities dealings in the United States, the court determines that Zahareas was associated with Tuschner & Co. Because Zahareas was associated with Tuschner & Co., Zahareas violated the Commission's bar order and Section 15(b)(6)(B)(i) of the Exchange Act. Further, as Tuschner testified, he was aware of the bar order as early as March 1996, therefore Tuschner & Co., through its CEO, violated Section 15(b)(6)(B)(ii) of the Exchange Act by permitting Zahareas to associate with it.

Finally, as the evidence in this case indicates, Tuschner substantially assisted both Zahareas' violation of Section 15(b)(6)(B)(i) of the Exchange Act and Tuschner & Co.'s violation of Section 15(b)(6)(B)(ii) of the Exchange Act. Tuschner negotiated the verbal agreement between Zahareas and Tuschner & Co. and arranged for Tuschner & Co. to indirectly compensate Zahareas first through his wife and then through Euroamerican. Tuschner facilitated the early trades, then later authorized the Tuschner & Co. trader to accept orders from Zahareas directly, which the trader did without question. As the Commission properly argues, without Tuschner's knowing permission and assistance as Tuschner & Co.'s CEO, Zahareas would not have been able to associate with Tuschner & Co. Therefore, a reasonable factfinder would conclude that Tuschner aided and abetted the violation by Zahareas of Section 15(b)(6)(B)(i) of the Exchange Act

and the violation by Tuschner & Co. of Section 15(b)(6)(B)(ii) of the Exchange Act. Accordingly, the court grants plaintiff's motion for summary judgment and denies defendant's motion for summary judgment.

## II. Permanent Injunction

■ To obtain a permanent injunction under the Exchange Act, the Commission must prove that Tuschner violated the law—which it has done—and that there is a reasonable likelihood of future violations. *See SEC v. Comserv Corp.,* 908 F.2d 1407, 1412 (8th Cir.1990); *see also* 15 U.S.C. § 78u(d)(1) (providing that upon "a proper showing" by the Commission, a permanent injunction shall be granted without bond). The Commission is not required to show irreparable injury or a balance of equities in its favor in order to make the statutory showing for injunctive relief. *See SEC v. Management Dynamics, Inc.,* 515 F.2d 801, 808 (2nd Cir.1975); *SEC v. Unifund SAL,* 910 F.2d 1028, 1036–37, 1040 (2nd Cir.1990).

■ With respect to the likelihood of future violations the Eighth Circuit has held that past violations indicate a propensity to engage in future violations. *See SEC v. Gruenberg,* 989 F.2d 977, 978 (8th Cir.1993) (granting SEC's motion for a permanent injunction solely upon the defendants' prior criminal violation of securities laws); *SEC v. First Am. Bank & Trust Co.,* 481 F.2d 673, 682 (8th Cir.1973) ("[T]he very existence of improper conduct in the past raises an inference that such conduct will continue in the future even though the improper conduct has been discontinued."). The likelihood of future violations also depends upon "whether a defendant's violation was isolated or part of a pattern, whether the violation was flagrant and deliberate or merely technical in nature, and whether the defendant's business will present opportunities to violate the

---

9. Consideration of the Commission's interpretation of the federal securities laws is appropriate as long as that interpretation is "rea-

sonable." *See Hertzberg v. Dignity Partners, Inc.,* 191 F.3d 1076, 1082 (9th Cir.1999).

law in the future." *SEC v. First City Fin. Corp.,* 890 F.2d 1215, 1228 (D.C.Cir.1989).

These considerations weigh in favor of a permanent injunction in this case. Tuschner did not commit an isolated violation. Rather, the association with Zahareas, which spanned one and a half years and generated contact with more than 200 Greek investors resulting in at least $213,-554.33 in gross commissions for Tuschner & Co., demonstrates a pattern of illegal activity. The court is particularly troubled by Tuschner's transparent attempts to conceal wrongdoing by: (1) paying commissions on the ACT IPO to Zahareas' wife, even though she had no role in the investment and (2) pursuing a business relationship with and completing trades for Nunox, despite Nunox' obvious connection to Zahareas.

Tuschner contends that injunctive relief is too harsh a sanction in this case, where "all that happened ... is that Greek investors who desired to acquire the shares of an American company were able to do so, and in doing so, most of them (if not all) profited handsomely." [Tuschner brief, p. 24]. The implication of this argument is that so long as the investors profited, the court may essentially disregard the fact that the defendants violated federal securities laws. The court rejects this premise and notes that injunctive relief is *proper even if there has been no showing that any particular investor has been harmed. See First Am. Bank,* 481 F.2d at 682. Accordingly, plaintiff's motion for permanent injunction is granted.

### CONCLUSION

For the foregoing reasons, **IT IS HEREBY ORDERED** that:

1. Plaintiff's motion for summary judgment is granted.

2. Defendant's motion for summary judgment is denied.

3. Plaintiff's motion for permanent injunction is granted.

Pursuant to Section 21(d)(1) of the Exchange Act, 15 U.S.C. § 78u(d)(1), defendant John M. Tuschner is hereby permanently restrained and enjoined from, directly or indirectly, aiding and abetting any violation of Sections 15(b)(6)(B)(i) and (ii) of the Exchange Act, 15 U.S.C. § 78*o*(b)(6)(B)(i) and (ii), by permitting, without the consent of the Commission, a person who has been barred from association with a broker or dealer to become or remain a person associated with the broker or dealer in contravention of this order.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**